In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2926

LIVELL FIGGS,

*Plaintiff-Appellant*,

*v.*

ALEX DAWSON and LORI FISHEL,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:13-cv-03218-CSB-EIL— **Colin S. Bruce**, *Judge.*

ARGUED MAY 27, 2016 — DECIDED JULY 25, 2016

Before POSNER and FLAUM, *Circuit Judges*, and ALONSO,
*District Judge.*[*]

ALONSO, *District Judge*. Plaintiff, Livell Figgs, was convicted
of murder and sentenced to 40 years' imprisonment in the
Illinois Department of Corrections ("IDOC"). He served the

---

[*] Of the Northern District of Illinois, sitting by designation.

latter part of his sentence at Logan Correctional Center and was released on June 28, 2012 after having survived summary judgment in his state-court mandamus proceeding in which he alleged that his release date had been miscalculated. Figgs then brought this § 1983 action against prison officials at Logan, alleging, among other things, that they had been deliberately indifferent to the possibility that he was being held unlawfully. Figgs now appeals from the district court's grant of summary judgment in favor of the defendants.

## FACTUAL BACKGROUND

On July 21, 1989, Figgs was arrested on a drug offense. He committed a murder on August 5, 1990 while on bond for the drug offense. After pleading guilty to the drug offense, Figgs was sentenced on April 23, 1991 in the Circuit Court of Cook County to a 4-year term of incarceration with credit for 201 days he had already served. On March 24, 1992, Figgs was arraigned in the Circuit Court of Cook County on a charge for the August 1990 murder. On December 4, 1992, Figgs completed his prison term on the drug sentence and began his term of Mandatory Supervised Release ("MSR"). Because he had been charged with murder, however, he was transferred that day from IDOC custody directly into Cook County custody pending trial.

On September 11, 1993, a jury convicted Figgs of first-degree murder. He was sentenced on October 25, 1993 to 40 years' imprisonment with credit for time served in custody since January 16, 1991, with the sentence to run consecutive to the sentence on the drug offense. On November 5, 1993, Figgs returned to IDOC custody.

On November 16, 1993, Figgs received a "Violation Report" from IDOC indicating that on December 4, 1992 (the date his MSR began on the drug conviction), he had violated the terms of his MSR by committing the murder for which he was serving the 40-year sentence. Figgs signed this report and acknowledged receiving it. The Illinois Prisoner Review Board ("PRB") entered an order on the same date, declaring that Figgs had violated his MSR as of December 4, 1992 by committing the murder. The PRB's order also stated: "Offender contends that he was incarcerated on the violation date (12/4/92). He subsequently pleaded guilty to poss of controlled subst. and was found guilty of murder." The form order did not have the box checked indicating that Figgs's parole or release was revoked, nor did it indicate the consequences of the determination that Figgs had violated his MSR. The order also did not indicate whether a hearing had been conducted or would be scheduled. The violation report and the PRB's order were entered in error; the murder occurred well before Figgs's conviction in the drug case, at a time when he was not on MSR.

After the PRB issued its order, IDOC's chief record officer sent multiple letters to the Cook County State's Attorney requesting that he review the mittimus (the order directing jailers to carry out the judgment) for Figgs's murder conviction. The letters noted that Figgs had completed his sentence for the drug offense on December 4, 1992 and was released on a two-year MSR term, which had not been revoked at the time he was sentenced on the murder conviction. The chief record officer explained that she sought clarification regarding whether the circuit court intended for Figgs's 40-year sentence to "run consecutive to any mandatory

supervised release violation time the inmate is required to serve as a consequence of the Prisoner Review Board's order revoking mandatory supervised release," and if so, asked the State's Attorney to ensure that a corrected mittimus was issued. The record does not reveal what prompted the requests or why the chief record officer sought clarification of Figgs's sentence from the State's Attorney, as opposed to seeking clarification directly from the court or from the PRB about the basis for its order.

While the chief record officer awaited a response to her letters, Figgs requested a transfer to a medium-security facility (at the time, he was incarcerated at Menard Correctional Center). In October 1994, an IDOC official, the assistant deputy director of adult institutions, responded in a letter stating that Figgs was ineligible for transfer and that his projected release date was January 16, 2011.

Two months later, on December 19, 1994, the circuit court issued a "corrected mittimus" in Figgs's murder case, which stated that Figgs's 40-year sentence was "to run consecutive to any sentence imposed after a violation of mandatory supervised release" in the drug case. It is not clear why the corrected mittimus was phrased this way, but the document evidently perpetuated the mistaken belief within IDOC that Figgs had violated his MSR term on the drug offense.

IDOC sentence calculations are prepared at the facility to which an inmate is first assigned. When an inmate is transferred to a different prison, the record office at the new prison does not usually perform a new calculation but simply checks the previous calculation for accuracy. If questions arise

about an inmate's sentence, the record office at the facility where the inmate is housed will review the sentence calculation, or it may refer the matter to the IDOC chief record office in Springfield, Illinois, which oversees each institution's record office. Each inmate's master file is kept at the facility at which the inmate is housed.

In January 1995 and again in May 1996, before Figgs was transferred to Logan, IDOC employees prepared handwritten sentence-calculation worksheets pursuant to the December 1994 "corrected mittimus." The calculations were prepared on a form used specifically for inmates who had been declared to have violated MSR. Figgs's projected release date, according to these worksheets, was November 3, 2013. It appears that this release date was computed by adding to the 40-year sentence a 2-year term resulting from the (assumed) revocation of MSR in the drug case and then adjusting for time served and good-time credit. The same calculation was repeated on subsequent sentence worksheets prepared in December 2001 and May 2003, although the projected release date changed due to later adjustments of good-time credit.

Figgs arrived at Logan in 2005. He says that he became aware in 2009 that Logan officials had miscalculated his sentence and projected release date. In the months leading up to January 2011 and thereafter, Figgs submitted several inmate request slips to various officials at Logan, including defendants Lori Fishel, who was the record office supervisor, and Alex Dawson, who was the warden, complaining about a miscalculation of his projected release date. Copies of these slips are not in the record, but it is undisputed that Figgs submitted them.

Fishel looked at Figgs's existing sentence calculation and believed that it was correct because in her view, Figgs was on MSR when he was sentenced for murder, so it appeared that he had violated MSR. Fishel understood the "corrected mittimus" as ordering Figgs to serve his 40-year sentence after the (nonexistent) two-year term for violating MSR. Because the matter seemed complex and Figgs raised "so many questions" in his complaints to her, she "didn't do too much with it" and instead let the IDOC's chief record office in Springfield handle it. Fishel referred the matter to Ona Welch, who was then the assistant chief record officer. Although Fishel sent some of the pertinent documents to Welch, including an inmate request slip, the corrected mittimus, the PRB's order, and a sentence calculation worksheet completed prior to Figgs's arrival at Logan, Fishel did not send Figgs's entire master file, nor did Welch request it.[1] According to Fishel, Welch told her that the current calculation was correct, and therefore Fishel informed Figgs of this determination. Although Figgs's projected release date changed during his incarceration due to the revocation of good-time credits, all of Figgs's previously-revoked good time credits were restored as of August 25, 2011.

On October 20, 2011, Figgs filed a petition for habeas corpus against Dawson in the Logan County Circuit Court. In that petition, Figgs alleged that he had "never had a[n MSR] revocation hearing or … been told that he violated mandatory supervised release" in the drug case. He also alleged that

---

[1] The chief record office does not maintain inmates' master files. They are kept at the institution where an inmate is incarcerated.

IDOC had erred in "starting his sentence credit to run after this alleged [MSR] violation."

On October 31, 2011, Figgs filed a formal IDOC grievance, marking it as an emergency and asserting that he should have been released from custody on January 16, 2011. He further asserted that the corrected mittimus for the murder conviction ordered his 40-year sentence "to run consecutive to ANY sentence imposed after a violation of mandatory supervised release" in the drug case, but there "was never a parole revocation or violation of [MSR]. Accordingly, there is no [MSR] violation to run this sentence consecutive too [sic]." A counselor discussed Figgs's concerns with Fishel, who reported that she had previously looked into the calculation of Figgs's release date and determined that it was correct. Fishel did not recalculate Figgs's sentence at this point or check again with the chief record office. The counselor indicated that the sentence calculation appeared to be correct because Fishel had stated that "[MSR] time stopped when [Figgs] committed offense. Sentence then ran consecutive with … [MSR] term. Forwarded to Warden Dawson." Dawson reviewed Figgs's grievance, but not his master file, and determined on November 8, 2011 that it was not an emergency after consulting Fishel, who confirmed that the sentence calculation was correct.

On November 28, 2011, Dawson moved to dismiss Figgs's state habeas petition on the basis that Figgs was serving a term of MSR at the time he committed the murder and therefore was being legally detained, rendering unavailable habeas corpus relief. On December 1, 2011, the state court dismissed Figgs's habeas complaint for the reasons set forth in Dawson's motion.

The court subsequently granted Figgs's motion to reconsider and for leave to amend his petition to seek mandamus relief, and Figgs restyled his petition as a mandamus complaint.

In the meantime, the grievance officer who was handling Figgs's IDOC grievance reported on November 30, 2011: "The records office supervisor contends that the inmate's corrected mittimus was adhered as directed by Judge James Flannery [who issued the mittimus]. Fu[r]thermore, the clinical service supervisor and the directing record office and the law office in Springfield concurred with the Logan's Record Office interpretation of the mittimus." The grievance officer recommended that the grievance be "withheld" (stayed) pending the outcome of Figgs's state habeas petition. On December 13, 2011, Dawson or someone acting on his authority concurred in this recommendation, and the grievance was stayed.

In November 2011, while the grievance and state-court case were pending, Figgs also wrote to IDOC's chief record officer, stating that record personnel at Logan had miscalculated his release date by factoring in a nonexistent parole violation. Figgs reiterated that during all his years of incarceration, he had never had an MSR violation or a hearing. Along with his letter, Figgs submitted the corrected mittimus and the October 1994 IDOC letter denying his request for a transfer from Menard and noting a January 2011 projected release date. On December 2, 2011, Welch responded to Figgs, attaching a copy of the PRB's order and stating: "Your current tentative mandatory supervised release date is November 3, 2013, as indicated on your sentence calculation work sheet dated May 3, 1996, because as of August 25, 2011, all of your revoked time

for disciplinary issues has been restored … . The sentence calculation has been completed per the Order of the sentencing court and Order of the [PRB]."

On March 6, 2012, Dawson filed a motion for summary judgment in the mandamus proceeding, arguing that the PRB had revoked Figgs's MSR and thus Figgs was lawfully incarcerated and could not be released until his consecutive sentences were completed. Fishel submitted an affidavit in support of the motion in which she stated that IDOC had released Figgs on December 4, 1992, he was then picked up on a Cook County warrant, and in 1993 after the murder conviction, the PRB had issued an order declaring Figgs to have violated MSR as of December 4, 1992. On June 26, 2012, the state court issued an order denying Dawson's motion for summary judgment, reasoning that Fishel's statement about Figgs's 2013 projected release date was "conclusory" because the calculations set forth in the attached sentence worksheet were "not self-explanatory and Defendant has failed to otherwise inform the court of the manner in which the Plaintiff's projected discharge date was determined."

The day after the state court denied Dawson's motion, the PRB vacated, without comment, its November 1993 violation order. According to Fishel, someone in IDOC's chief record office prompted the PRB to review its order. The following day, Fishel recalculated Figgs's release date as January 11, 2011,[2] and Figgs was immediately released from prison. The

---

[2] Although defendants do not appear to dispute that this was the correct release date, we have some reservations about it. The original mittimus for

(continued...)

Logan County Circuit Court subsequently dismissed the
mandamus proceeding as moot.

## PROCEDURAL HISTORY

On January 4, 2013, Figgs filed his complaint in the instant
case against Austin Randolph (a former warden of Logan),[3]
Dawson, and Fishel. Figgs alleged that Dawson and Fishel
violated his Eighth and Fourteenth Amendment rights. He also
brought state-law claims for false imprisonment and
negligence. Defendants moved for summary judgment on all
of Figgs's claims, and Figgs moved for summary judgment on
his Eighth Amendment claim against Dawson and Fishel and

---

[2] (...continued)

the murder conviction stated that Figgs was to receive credit for time served
since January 1991 (when he was still serving the sentence on the drug
conviction) while at the same time stating that the sentence was to run
consecutive to the drug sentence. Illinois law, 730 ILCS 5/5-8-4(d)(8) (which
was section 5-8-4(h) at the relevant time), requires consecutive sentencing
where a defendant is charged with a felony and commits a separate felony
while on pretrial release. The "corrected" mittimus muddied the waters by
omitting any reference to the drug sentence and providing for the murder
sentence to run consecutive to a nonexistent "sentence" for a nonexistent
MSR violation. It is possible that the newly-calculated January 2011 release
date was in fact incorrect in that it would have allowed Figgs to have served
partially concurrent sentences in contravention of the consecutive-sentence
requirement. The record does not enable us to confidently draw a
conclusion about the correct release date.

[3] No claims against Randolph are involved in this appeal, and the record
does not disclose why he was not dismissed from this action. Although his
name is included in the caption on the complaint and there are certain
factual allegations against him, plaintiff did not attempt to state any claim
against him.

Fourteenth Amendment procedural due process claim against Dawson. On August 4, 2015, the district court granted defendants' motion for summary judgment, and entered judgment in their favor, on Figgs's federal claims. The court then declined to exercise supplemental jurisdiction over Figgs's state-law claims and dismissed them without prejudice.

Figgs filed this timely appeal, challenging the grant of summary judgment in favor of Fishel and Dawson on the Eighth Amendment claim for deliberate indifference and the grant of summary judgment in favor of Dawson on the Fourteenth Amendment procedural due process claim.

## DISCUSSION

We review de novo the district court's grant of summary judgment, considering all facts and reasonable inferences in the light most favorable to Figgs, the nonmoving party. *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). Summary judgment is proper only where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). We may affirm on any basis fairly presented in the record. *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011).

### A. Deliberate Indifference

When reviewing a grant of summary judgment on a § 1983 claim, we focus on "'(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws

of the United States.'" *Armato v. Grounds*, 766 F.3d 713, 719-20 (7th Cir. 2014) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Incarceration beyond the date when a person is entitled to be released violates the Eighth Amendment if it is the product of deliberate indifference. *Burke v. Johnston*, 452 F.3d 665, 669 (7th Cir. 2006); *Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir. 2001).

Deliberate indifference requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk. *Armato*, 766 F.3d at 721; *McGee v. Adams*, 721 F.3d 474, 480-81 (7th Cir. 2013). A state officer is deliberately indifferent when he does nothing, *Hankins v. Lowe*, 786 F.3d 603, 605 (7th Cir. 2015), or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred, *Burke*, 452 F.3d at 669 (citing *Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993)); *see also Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (noting that a prison doctor demonstrates deliberate indifference by pursuing treatment "so blatantly inappropriate as to evidence intentional mistreatment").

It is undisputed that Dawson and Fishel knew of the possibility that Figgs was being held beyond the date when he was entitled to be released, but it is disputed whether their conduct amounted to deliberate indifference. As for Dawson, the district court first noted that it is undisputed that the warden was not responsible for calculating prisoners' release dates. He was responsible, however, for reviewing emergency grievances, and it was his or his designee's decision to treat Figgs's grievance as a non-emergency and withhold review until the state-court action was resolved. The district court

concluded that the undisputed evidence showed that Dawson checked whether Logan's release date for Figgs matched the most recent sentence calculation sheet, asked the Logan record office whether the date was correct, and confirmed that Fishel had reviewed Figgs's file and she believed the release date to be correct. Dawson therefore took some steps to address Figgs's grievance, the district court reasoned, so Figgs could not establish that Dawson was deliberately indifferent. The court further held that Dawson's decision to let the state court determine the validity of Figgs's claims, which was made after his consultation with the record office and determination that the grievance was not an emergency, was not evidence of deliberate indifference.

The district court correctly granted summary judgment for Dawson on this claim. Dawson's conduct does not demonstrate a sufficiently culpable state of mind. He did not disregard Figgs's grievance or its designation as an emergency; rather, he consulted with Fishel, the record office supervisor, to make sure that she had looked into the problem, and he relied on her determination that the calculations Logan was using were correct. That was a reasonable response to Figgs's emergency grievance, as was Dawson or his designee's ensuing decision to stay the grievance pending resolution of the mandamus proceeding. *See Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) (warden was not deliberately indifferent where he investigated the situation, ensured that the medical staff was monitoring and addressing the problem, and reasonably deferred to the medical staff's opinion); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (no deliberate indifference where grievance appeals examiner investigated plaintiff's complaints

and referred them to the medical providers who could be expected to address plaintiff's concerns). Top-level administrators like Dawson are entitled to relegate to prison staff like Fishel the primary responsibility for specific prison functions. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (a prison warden is entitled to relegate to medical staff the provision of medical care). Figgs contends that what Dawson did was "not really anything of substance," but this argument is misplaced because it was not Dawson's responsibility to calculate, or investigate the calculation of, Figgs's release date, and Dawson consulted with the individual who had that responsibility. *See id.* at 595 ("Public officials do not have a free-floating obligation to put things to rights … . Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.").

Fishel's conduct is another matter. The district court held that Figgs cannot prove that Fishel was deliberately indifferent to the risk of prolonged detention because she took "numerous steps" to determine whether Figgs's concerns were warranted. The court explained that Fishel did not ignore or suppress Figgs's complaints, but took the following steps: (1) relied upon the sentence calculation made prior to Figgs's arrival at Logan; (2) forwarded certain documents to the chief record office; and (3) relied upon that office's determination that the sentence calculation was correct. On appeal, plaintiff points out that Fishel personally did not attempt to calculate Figgs's

sentence until June 27, 2012, and contends that her act of forwarding a few documents from the master file to someone who was thus not fully equipped to evaluate the problem was so woefully inadequate that it amounted to deliberate indifference. Fishel, on the other hand, asserts that she "thoroughly investigated" Figgs's complaints.

When evaluating Fishel's conduct, it is important to consider the substance of Figgs's complaints. In his emergency grievance, Figgs was not complaining about simple arithmetic, but that his projected release date was premised on the falsehood that he was on MSR when he committed the murder for which he was serving his sentence. He was asking prison officials to verify the basis for the addition of two years to his sentence. Although copies of Figgs's inmate request slips are not in the record, it can reasonably be inferred from Fishel's deposition testimony that Figgs made the same kind of substantive complaints several months earlier in his request slips. In response, Fishel admittedly did not perform any calculation, nor did she review all of the documents in Figgs's master file. In Fishel's own words, she responded to those complaints by "let[ting] the chief records office handle it" because Figgs raised "so many questions" in his multiple request slips, the matter was "complex," and she was not sure about the calculation. Fishel was the only one who had Figgs's master file, yet when she referred the matter to the chief record office, she sent only an inmate request slip from Figgs, the previous sentence calculation sheet, the corrected mittimus, and the PRB's order. Fishel did not send anything else from Figgs's file (such as a Statement of Facts that would have indicated when the murder had been committed) that would

have enabled the chief record office to determine whether Figgs's complaints had any merit or whether further investigation was needed. There is no evidence that Fishel had discussions with the chief record office, contacted the PRB, or sought legal guidance from any state officials such as IDOC attorneys, the Circuit Court, or the Office of the Attorney General, even when the matter resurfaced by way of the emergency grievance.[4] Furthermore, Julia Bickle, who succeeded Ona Welch as assistant chief record officer in Springfield, testified at her deposition that it was the responsibility of the chief record officer at the facility where an inmate is housed to contact the PRB or the court for clarification of orders that are necessary to properly calculate a sentence.

The record belies Fishel's assertion that her investigation of Figgs's complaints was "thorough." Her reliance upon the previous sentence calculation, which was done long before Figgs complained, did not constitute a step taken to verify its accuracy (nor did her reliance upon the chief record office's determination). The only action she took prior to the state court's denial of Dawson's summary judgment motion was forwarding selected portions of Figgs's master file to the chief record office after receiving several inmate request slips. In response to Figgs's emergency grievance, Fishel relied on the

---

[4] Although the clinical services counselor who reviewed and responded to Figgs's grievance stated in his response that "the law office in Springfield concurred with" the Logan Record Office's "interpretation" of the mittimus, the record does not reveal who contacted the "law office in Springfield." Fishel did not testify at her deposition that she did.

same prior determination by the chief record office without further investigation. Given the circumstances, a jury could find that this minimal action was so ineffectual that it rose to the level of criminal recklessness and thus constituted deliberate indifference. Therefore, we will vacate the grant of summary judgment for Fishel on this claim and remand for trial.[5]

Fishel argues that even if a reasonable factfinder could conclude that she violated Figgs's Eighth Amendment rights, summary judgment in her favor was proper on an alternative ground, qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In general, once the defendants raise the qualified immunity defense, the plaintiff must show two things: first, that there has been a violation of one or more of

---

[5]  It should be noted, however, that even if Figgs proves that Fishel acted with deliberate indifference, he must also prove that this deliberate indifference caused him to be held beyond his lawful term of incarceration. *See, e.g., Armato*, 766 F.3d at 721. Causation could be difficult to prove for the reasons discussed above at footnote 2. Still, we are not persuaded by Fishel's causation-related arguments on appeal. They are myopically focused on the sentence calculation itself and ignore the specific issues raised by Figgs, the problems with the PRB's order, and the admittedly confusing "corrected" mittimus. Although Fishel points out that she had no authority to disregard court and PRB orders, she fails to acknowledge that she had other courses of action such as making inquiries of the PRB or court and seeking legal guidance.

her federal constitutional rights, and second, that the constitutional standards at issue were clearly established at the time of the alleged violation." *Campbell*, 256 F.3d at 699 (citations omitted). The law is "clearly established" when "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Id.* at 701 (emphasis and internal quotation marks omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established. *Id.* (internal quotation marks omitted) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

Fishel contends that "no clearly established constitutional rule established that [she] violated the Eighth Amendment by failing to recalculate Figgs's sentence in response to his concerns or by referring it to" the chief record office. This argument is flawed because it does not address the broader deficiencies with Fishel's chosen course of action, which we have discussed above. The appropriate inquiry here is whether it was clearly established that Fishel's failure to investigate the substance of Figgs's complaints violated his constitutional rights by requiring him to serve more time than his sentence required. *See id.* at 700-01 ("[W]e must determine whether it was clearly established that the defendants, in revoking the good conduct credits and computing a new release date after the recommitment, were violating Campbell's constitutional rights by requiring him to serve more time than state law and his sentence required.").

At the time Figgs presented his complaints, it was clearly established by decisions in closely analogous cases that the failure to investigate a claim that an inmate is being held longer than the lawful term of his sentence violates the Eighth Amendment if it is the result of indifference. *See Haygood v. Younger*, 769 F.2d 1350, 1354-55 (9th Cir. 1985) (holding that the Eighth Amendment is violated when prolonged detention is the result of deliberate indifference, where prison officials failed to investigate claims in prisoner's letter questioning the method used to compute his release date); *Sample v. Diecks*, 885 F.2d 1099, 1108-10 (3d Cir. 1989) (holding same, where senior record officer failed to take substantive action on prisoner's claim that he was being held despite the expiration of his sentence); *Alexander v. Perrill*, 916 F.2d 1392, 1397-99 (9th Cir. 1990) (rejecting defendants' qualified immunity argument and concluding that the right to be free from incarceration beyond the expiration of one's sentence was clearly established, where prison officials failed to investigate the prisoner's claim that he was incorrectly denied credit for time served in a foreign jail). While, to be clearly established, "a right must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim," the "very action in question" need not have previously been held unlawful for a public official to have reasonable notice of the illegality of some action. *Viilo v. Eyre*, 547 F.3d 707, 710-11 (7th Cir. 2008) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) and *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Viewing the record in the light most favorable to Figgs, the evidence supports his claim that Fishel's conduct violated his established constitutional right to be free from cruel and

unusual punishment. Thus, Fishel is not entitled to qualified immunity.

After dismissing Figgs's federal claims, the district court declined to exercise supplemental jurisdiction over the state-law false imprisonment claim against Dawson and negligence claim against Dawson and Fishel. Because we are vacating the judgment on the Eighth Amendment claim against Fishel, and the state-law claims relate to the same set of operative facts, we reinstate those claims as to all defendants they are asserted against. *See Edwards v. Snyder*, 478 F.3d 827, 832 (7th Cir. 2007) (citing *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 975 (7th Cir. 2002) and *Armstrong v. Squadrito*, 152 F.3d 564, 582 (7th Cir. 1998)).

### B. Procedural Due Process

Figgs also challenges the district court's grant of summary judgment in favor of Dawson on Figgs's Fourteenth Amendment claim for violation of procedural due process. Figgs had a constitutionally-protected liberty interest in being released from prison before the end of his term for good behavior. *See Toney-El v. Franzen*, 777 F.2d 1224, 1227 (7th Cir. 1985) (citing *McKinney v. George*, 726 F.2d 1183, 1189 (7th Cir. 1984)). To prove a deprivation of procedural due process, Figgs must show: (1) the deprivation occurred; (2) it occurred without due process of law; and (3) Dawson subjected him to the deprivation. *See id.* "In section 1983 actions challenging the mistakes made by state employees rather than the state procedures by which those mistakes were made, *Parratt* requires a court to consider the adequacy and availability of remedies under state law before concluding that a deprivation

of life, liberty, or property violates due process of law." *Id.* (internal quotation marks and citations omitted); *see also Armato*, 766 F.3d at 722 (noting that in *Toney-El*, this court found that state-court remedies such as the right to seek a writ of mandamus and a cause of action for false imprisonment are "adequate and available" remedies for an inmate claiming he was held beyond the term of his incarceration, precluding a claim for a violation of procedural due process).

Figgs claims that Dawson violated his procedural due process rights by deferring action on Figgs's grievance until resolution of the state-court mandamus proceeding. In granting summary judgment in Dawson's favor, the district court relied on *Toney-El* and *Armato* and held that not only did Figgs have available and adequate state-court remedies, he took advantage of them by filing the mandamus proceeding. Figgs asserts on appeal, as he did before the district court, that the mandamus proceeding was inadequate because it was pending for several months until he was able to obtain a ruling that led to his release.

In *Toney-El*, this court found that the state-court habeas corpus remedy was adequate despite the fact that the prisoner plaintiff had been held for 306 days past his lawful term of incarceration. Like Toney-El, Figgs did not utilize his state-court remedy until well after the point in time when he maintains he was deprived of his liberty. Figgs cites no authority for the proposition that because he did not obtain immediate relief, his mandamus remedy was inadequate. Accordingly, we agree with the district court that the state-court remedy, which Figgs utilized, precludes his claim against Dawson for procedural due process.

## CONCLUSION

We AFFIRM the grant of summary judgment in favor of Alex Dawson on plaintiff's Eighth Amendment and Fourteenth Amendment claims. We VACATE the grant of summary judgment in favor of Lori Fishel on plaintiff's Eighth Amendment claim for deliberate indifference, VACATE the dismissal of the state-law false imprisonment and negligence claims, and REMAND the case to the district court for further proceedings on those claims.